IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 12-cr-30037 |
| | ) | |
| TIMOTHY HIBBS, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION

RICHARD MILLS, U.S. District Judge:

The Court denies the Motion to Suppress [d/e 9] and adopts the

Report and Recommendation [d/e 16] for the following reasons.

I.

The Court notes that it has carefully reviewed the Report and

Recommendation [d/e 16] entered by U.S. Magistrate Judge Byron G.

Cudmore, the documents filed in this case related to suppression (with

their attached exhibits), and the authorities cited therein.

The Court further notes that the Defendant did not request an

evidentiary hearing, and no hearing was held.  *See* Reply to

Government's Response to Defendant's Motion to Suppress [d/e 14],

page 5; Text Order of June 13, 2012, entered by U.S. Magistrate Judge

Byron G. Cudmore.

## II.

Judge Cudmore described the facts as follows:

On February 23, 2012, an Adams County, Illinois, state court judge issued the Warrant. The Judge found probable cause to authorize the search. Hibbs does not challenge the validity of the affidavit presented to secure the Warrant or the Judge's finding of probable cause to issue the Warrant.

The Warrant directed officers to conduct the following search:

> I, therefore, command that you search:
>
> The residence of Timmy J. Hibbs WM DOB 06-08-64, being a one story residence located at 1308 Jefferson Quincy, Adams County, IL. This is a one story residence with gray colored siding. There is also a detached garage with the numbers "1308" are affixed on a pillar. The entrance to 1308 Jefferson faces East and is located on the North side of the residence. The residence is located between the streets of 12th and 15th on Jefferson.
>
> And seize: Methamphetamine, Methamphetamine precursors, equipment and instrumentalities utilized in the production of Methamphetamine, Methamphetamine related waste, Drug Ledgers, USC, proof of residency.

Law enforcement officers executed the Warrant at 7:30 p.m. on February 23, 2012. Officers searched the house and found items in the basement and living room, including a receipt for drain cleaner, syringes, a spoon, a corner cut baggie, a battery package, a small round container with an unspecified residue, and a razor blade.

Law enforcement officers also searched the back yard at 1308 Jefferson Street. The yard was fenced on three sides. Officers found two 4-wheelers and a boat in the yard. The officers searched the boat and the 4-wheelers. The evidence log indicates that the officers found several items of evidence including a bag containing 68.10 grams of methamphetamine under the seat of one of the 4-wheelers.

At the time of the search, a truck was parked on the street in front of 1308 Jefferson and a Ford Mustang was parked in the front yard. The officers brought a drug sniffing dog with them during the search. The dog alerted on both vehicles. Officers searched the vehicles and found a bag of syringes and a digital scale in the glove box of the Mustang and a black hose with a fitting in the truck's toolbox and an empty fuel can in the bed of the truck. Hibbs moves to suppress everything found outside of the house and garage.

Report and Recommendation [d/e 16], pages 2-4 (citations omitted).

III.

A.

The Defendant seeks to suppress the items found in the window well of the home. The Defendant claims that the basement window well is part of the home's curtilage, and that officers performed an unconstitutional search and seizure when they removed the items from the apparently uncovered window well.

The Defendant objects, claiming that the warrant authorized the search of the house, but did not authorize a search of the grounds, or anything found thereon.

## B.

The Court concludes that the officers were authorized to search the curtilage of the home. The Court is not persuaded by Defendant's arguments regarding *United States v. Griffin*, 827 F.2d 1108 (7th Cir. 1987). The Court recognizes that the term "premises," as it is commonly used, means a tract of land and the buildings and improvements thereon (including outbuildings). *See id.* at 1114-15. The undersigned has relied upon this principle in deciding suppression issues previously, as pointed out by the Defendant. *See United States v. Burge*, No. 11-cr-30003, 2011 WL 2457309, at *3-*4 (C.D. Ill. June 16, 2011) (Mills, J.) (citing *Griffin*, and holding that warrant authorizing search of rural "premises" included a clearing outside of the curtilage, about 100 yards from the trailer home).

*Griffin* stands for the proposition that premises include buildings and land, and that a search warrant for the premises expressly authorizes

the search of both buildings and land. The Defendant argues that *Griffin* also stands for a corollary—that a search warrant authorizing the search of a residence does not cover the curtilage of the home, and that officers are not allowed to search, or even enter, the curtilage of such a residence.

The Court is unaware of any order or opinion from the U.S. Court of Appeals for the Seventh Circuit supporting such a broad interpretation of *Griffin*.

*Griffin* establishes that a search warrant authorizing the search of a premises *explicitly* authorizes a search of any area of, or building upon, the tract of land. This includes a search of an area *beyond the curtilage* of the residence, as happened in *Burge*.

When a search warrant authorizes the search of a residence, it may *implicitly* authorize the search of an area *within the curtilage* of the home.

Using the term "premises" can allow a court to quickly cut off any argument regarding the scope of the search, while using the term "residence" may require more analysis. Also, the term "premises"

includes those areas that are on the property, but outside the curtilage of the residence.

So, the choice between using "premises" or "residence" in a search warrant is significant, both in terms of defining the scope of the search and in how a court might adjudicate suppression issues. However, in some circumstances, the result will be the same, because both terms can authorize the search of the exact same areas.

C.

Neither the Court nor the parties have been able to find any Seventh Circuit opinions directly on point. The Court has examined the non-binding authority cited by the parties, has conducted additional research, and concludes that the Government's position is more persuasive.

The U.S. Court of Appeals for the Ninth Circuit has held that a warrant authorizing the search of a residence also authorizes the search of the curtilage of the residence. *See United States v. Gorman*, 104 F.3d 272, 275-76 (9th Cir. 1996); *see also United States v. Cannon*, 264 F.3d

875, 880-81 (9th Cir. 2001); *United States v. Hinton*, 33 Fed. App'x 366, 366-67 (9th Cir. 2002).

The Ninth Circuit stated the following in *Gorman*:

> If a search warrant specifying only the residence permits the search of "closets, chests, drawers, and containers" therein where the object searched for might be found, so should it permit the search of similar receptacles located in the outdoor extension of the residence, i.e., the curtilage, such as the container in this case. To hold otherwise would be an exercise in pure form over substance.

*Gorman*, 104 F.3d at 275.

Other circuits have come to the same conclusion. *United States v. Montieth*, 662 F.3d 660, 670 n.2 (4th Cir. 2011); *United States v. Pennington*, 287 F.3d 739, 744-45 (8th Cir. 2002); *United States v. Campbell*, 256 F.3d 381, 390 (6th Cir. 2001) (abrogated on other grounds); *United States v. Stanley*, 597 F.2d 866, 868 n.2, 869-70 (4th Cir. 1979); *see also United States v. Biles*, 100 Fed. App'x 484, 491 (6th Cir. 2004) ("Generally, 'a warrant for the search of a specified residence or premises authorizes the search of auxiliary and outbuildings within the curtilage.'") (quoting *United States v. Watkins*, 179 F.3d 489, 505 (6th Cir. 1999) (Boggs, J., concurring)).

District courts have also adopted the same position. *See United States v. Brown*, 822 F. Supp. 750, 754 (M.D. Ga. 1993); *Martin v. Indiana State Police*, 537 F. Supp. 2d 974, 981-82 (S.D. Ind. 2008) (Hamilton, C.J.); *United States v. Pugh*, No. 302CR69(CFD), 2003 WL 21220333, at *4 (D. Conn. 2003);

In *Brown,* the district court explained as follows:

> Given the common sense and rational approach that is to be taken in situations such as this one, the court notes that the expectation of privacy within one's home is much greater than outside in the yard. The search warrant in this case authorized intrusion into the area of highest expectation of privacy. It seems logical and reasonable that a search warrant that authorizes intrusion on this greater area of privacy would include authorization for intrusion in the lesser area of privacy, the backyard. It is a basic rule of logic that the greater generally includes the lesser. . . .

> ....

> Plain reading and common sense are the landmarks for the execution and interpretation of the language of a search warrant. As discussed earlier, there is no room in the midst of a criminal investigation for hypertechnical reading or interpretation of a search warrant.

822 F. Supp. at 754.

Many state courts have also adopted the approach advocated by the Government. *See Brown v. State*, 262 Ga. 728, 729 (1993) ("a search

warrant for a residence authorizes a search of the curtilage of that residence, which includes yards and grounds and buildings"); *Sowers v. State*, 724 N.E.2d 588, 589-591 (Ind. 2000) ("when police obtained a valid warrant to search the residence at 801 West Neely Street, they were also authorized to search the tent in the backyard of the residence"); *State v. Ogden*, 210 Kan. 510 (1972) (search warrant authorizing search of "white frame residence" allowed officers to search trash can located at the rear of the yard); *State v. Basurto*, 15 Kan. App. 2d 264, 268-69 (1991); *People v. McGhee*, 255 Mich. App. 623 (2003); *State v. Potter*, 72 S.W.3d 307, 314-15 (Mo. App. 2002); *State v. Vicars*, 207 Neb. 325, 330-31 (1980); *State v. Trapper*, 48 N.C. App. 481, 486-87 (1980); *State v. Dalpiaz*, 151 Ohio App. 3d 257, 263-64 (2002); *State v. Grevas*, 145 Ohio Misc. 2d 24, 30 (Ohio Ct. Com. Pl. 2007); *Ford v. State*, 245 P. 909, 909-910 (Okla. Crim App. 1926); *Seals v. State*, 11 S.W.2d 879, 881 (Tenn. 1928); *State v. Stewart*, 129 Vt. 175, 177, 179 (1971); *Meek v. Pierce*, 19 Wis. 300 (1865).

The primary case relied upon by the Defendant is *United States v. Longie*, 370 F. Supp. 2d 941 (D.N.D. 2005). In *Longie*, a search warrant

authorized the search of a house, but the officers searched a shed 60 yards away from the residence and found a firearm. *See id.* at 943-44. Ultimately, the district court held in *Longie* that the evidence had to be suppressed because the shed was not within the curtilage of the home. *Id.* at 945. Alternatively, the district court held that if the shed was inside the curtilage a new warrant should have been sought. *Id.* at 945-46. The Defendant is relying on this alternative holding.[1]

The Court finds *Gorman, Brown*, and the other cases cited above to be more persuasive than *Longie*.

## D.

The Defendant has argued the law enforcement officers exceeded the authorized scope of the search, because they continued searching for drugs and drug paraphernalia after they found drug paraphernalia in the house. *See* Motion to Supress [d/e 9], pages 3-4. The Defendant states, "Once the police found the allegedly drug-related items which were specified in the warrant, the police were required to end their search."

---

[1] The parties' discussion regarding whether *Longie* is in conflict with *Pennington* largely becomes a moot issue with the recognition that the primary holding of the district court in *Longie* was a fact-based curtilage determination.

*See id.* at 4.  The Defendant has relied upon *United States v. Odland*, 502 F.2d 148, 153 (7th Cir. 1974), which states that "[o]nce the item particularly described in the warrant is found, the search must end, but other evidence or contraband found in the course of a proper search for the item particularly described may be seized."

In *Odland*, the warrant authorized a search for "'an envelope addressed to Patsy Klein, care of Danial [*sic*] Schwartzman, 11990 Long Lake Drive, Wind Lake, Wisconsin 53185 U.S.A. containing 8.8 grams of suspected cocaine." *Id.* at 152.  In other words, they were searching for a *certain piece of evidence* that was specifically known to exist (because Customs officials in New York had already intercepted the envelope, and sent it on to Wisconsin after notifying a Customs special agent in Milwaukee, *see id.* at 150, 151-52).

Therefore, the principle enunciated in *Odland* relates to instances when officers are authorized to search for certain specific items, not categories of items.  *See United States v. Schire*, 586 F.2d 15, 17 (7th Cir. 1978) (citing *Odland* and relating to a warrant authorizing a search for a silver Trans Am automobile in a warehouse); *State v. Loeffelholz,*

No. 89-0137-CR, 1989 WL 154432, at *4 (Wis. Ct. App. 1989) (citing

*Odland* and relating to a warrant describing three pigs).

In the instant case, law enforcement officers were directed to seize

"[m]ethamphetamine, [m]ethamphetamine precursors, equipment and

instrumentalities utilized in the production of [m]ethamphetamine,

[m]ethamphetamine related waste, [d]rug [l]edgers, [U.S. Currency],

[and] proof of residency." Warrant [d/e 12-1], page 3.

While this generalized description was sufficient to satisfy the

Fourth Amendment's particularity requirement, *see United States v.*

*Wicks*, 995 F.2d 964, 973-74 (10th Cir. 1993), it is a broad description

of drugs and drug paraphernalia. The warrant did not direct officers to

search for *certain items* for the purposes of *Odland*.

Accordingly, *Odland* is not applicable, and the officers were not

required to stop the search after finding the items inside the house.

E.

In any event, the seizure of the items from the window well was

permissible. When officers executed the search warrant at the home,

they found the Defendant's adult son in the basement next to a window.

*See* Illinois State Police Supplementary Report [d/e 12-2], page 5. Officers discovered that the window leading to the window well was unlocked from the inside, and there was a hole in the screen. *See id.*

The officers concluded that the items found in the window well were placed there from the inside of the home. *See id.* It had rained prior to the execution of the search warrant, but the evidence seized from the window well was dry, while the remaining items in the window well were damp. *See id.*

All indications suggest that the Defendant's son expelled the evidence from the home either shortly before, or during, the execution of the search warrant.

The Court concludes that the seizure of these items was permissible. The apparent conduct of the Defendant's son is comparable to that of individuals who attempt to flush drugs down toilets during the execution of search warrants. The evidence was apparently expelled from the interior of the home (where the expectation of privacy is the greatest), to the exterior of the home (where there is less of an expectation of privacy).

The officers could have searched the window well as a search incident to arrest. (The Defendant's son was arrested for possession of methamphetamine.)

He was adjacent to the window leading to the window well at the time he was arrested. It would have been reasonable for officers to expect to find methamphetamine-related items in the window well. *See United States v. Sloan*, 636 F.3d 845, 852 (7th Cir. 2011).

IV.

A.

The Defendant claims that law enforcement officers illegally searched the Defendant's Chevrolet truck parked on the street in front of the home. A police canine passed near the vehicle and alerted to the presence of illegal drugs.

The Defendant has not clearly articulated the basis for his claim that the search was illegal, other than it was conducted without a warrant. He claims that "subjecting it to the canine's drug-sniff (the event that allegedly gave the police probable cause to search the truck)

was a violation of his Fourth Amendment rights."  Defendant's Reply [d/e 19], page 6.

## B.

The Defendant's argument is meritless.

The unoccupied truck was parked on a *public street*, not the Defendant's land, so it is not within the curtilage.  *See United States v. Hernandez*, 647 F.3d 216, 219 n.3 (5th Cir. 2011) ("a public street can never fall within a home's curtilage").  The Defendant's privacy interest was minimal.  *Cf. Texas v. Brown*, 460 U.S. 730, 740 (1983) ("There is no legitimate expectation of privacy . . . shielding that portion of the interior of an automobile which may be viewed from outside the vehicle by either inquisitive passerby or diligent police officers.") (abrogated on other grounds); *United States v. Orozco*, 590 F.2d 789, 792 (9th Cir. 1979) ("The deputies' looking through the windows of a vehicle parked on a public street did not violate appellant's reasonable expectations of privacy; anyone walking past the vehicle could have easily observed the packages of cocaine and heroin.").

As a result, the officers had every right to approach the vehicle and walk around it with a canine. Walking a drug dog around the outside of a truck *is not a search*. *See City of Indianapolis v. Edmond*, 531 U.S. 32, 40 (2000) ("The fact that officers walk a narcotics-detection dog around the exterior of each car at the Indianapolis checkpoints does not transform the seizure into a search. . . . an exterior sniff of an automobile does not require entry into the car and is not designed to disclose any information other than the presence or absence of narcotics."); *see also United States v. Place*, 462 U.S. 696, 707 (1983); *Illinois v. Caballes*, 543 U.S. 405, 409 (use of well-trained drug dog does not generally implicate legitimate privacy interests; any intrusion on privacy expectations "does not rise to the level of a constitutionally cognizable infringement"); *United States v. Loera*, 565 F.3d 406, 410 (7th Cir. 2009) (in the vehicle context, "a dog sniff is not a 'search' within the meaning of the Fourth Amendment").

Unlike the cases cited above, there was no initial seizure of the truck in the instant case—it was simply parked on the street.

In the absence to any argument to the contrary, the Court assumes that the canine was well-trained and reliable.  The Court notes that there were additional bases to conduct the search—the arrest of the Defendant, the confidential informant's purchase of meth from the Defendant, and that an impartial magistrate had signed a warrant to search the Defendant's home for illegal drugs.  For these reasons, and the positive alert, the officers had, under the totality of the circumstances, probable cause to suspect that drugs or drug paraphernalia would be found in the vehicle.  "Under the automobile exception to the warrant requirement, a law enforcement officer need not have a warrant to search a vehicle when there is probable cause to believe that the search will uncover contraband or evidence of a crime."  *See United States v. Hines*, 449 F.3d 808, 814 (7th Cir. 2006) (quotation marks omitted).  Therefore, the search was authorized under the automobile exception.

## C.

The only cases raised by the Defendant are distinguishable.  *United States v. Grupee*, 682 F.3d 143 (1st Cir. 2012) (Souter, J.) relates to a

vehicle parked in a residential driveway, and is thus inapplicable to the truck parked in the street.

The case of *Jardines v. State*, 73 So. 3d 34 (Fla. 2011), relates to a drug dog sniffing at the front door of a residence.  The Supreme Court has granted certiorari.  *See Florida v. Jardines*, 132 S. Ct. 995 (2012). The question presented in *Jardines* is the following: "Whether a dog sniff at the front door of a suspected grow house by a trained narcotics dog is a Fourth Amendment search requiring probable cause?"  Question Presented, *Florida v. Jardines*, No. 11-564, available at http://www.supremecourt.gov/qp/11-00564qp.pdf (last visited Sept. 6, 2012).

The Court has reviewed the following materials from the *Jardines* case: opinion of the Supreme Court of Florida, the parties' briefs on the merits, and the numerous briefs submitted by amici curiae.  The Court concludes that *Jardines* is distinguishable from the case at bar, and notes that the respondent and amici in support of the respondent have distinguished *Jardines* from cases involving dog sniffs of cars.  *See* Brief for Respondent at 29-30, *Florida v. Jardines*, No. 11-564 (June 25,

2012); Brief of Amici Curiae Fourth Amendment Scholars in Support of Respondent at 6-8, *Florida v. Jardines*, No. 11-564 (July 2, 2012); Brief of Amici Curiae the National Association of Defense Lawyers and the Florida Association of Criminal Defense Lawyers in Support of Respondent at 2, 20-22, *Florida v. Jardines*, No. 11-564 (July 2, 2012). Accordingly, the Court concludes that *Grupee* and *Jardines* are inapposite.

## D.

The Court has also reviewed another case from the Supreme Court of Florida: *Harris v. State*, 71 So. 3d 756 (2011). The U.S. Supreme Court has granted certiorari, and the case is set for argument the same day as *Jardines*. *See Florida v. Harris*, 132 S. Ct. 1796 (2012) (granting cert.). *Harris* raises the following issues:

(1) Whether officers may search a vehicle based solely on an alert by a drug dog? and

(2) What is required to establish that a drug dog is well-trained?

*See* Question Presented, *Florida v. Harris*, No. 11-817, available at http://www.supremecourt.gov/qp/11-00817qp.pdf (last visited Sept. 24, 2012).

The Court has reviewed the decision from the Supreme Court of Florida and the briefs filed before the U.S. Supreme Court, and concludes that *Harris* does not directly bear on this issue. As detailed above, the probable cause to search the truck went beyond solely the dog alert. Also, the Defendant has not challenged the training or reliability of the dog.

## V.

The Defendant challenges the officers' search of his white Ford Mustang located in his yard.

### A.

### 1.

The Defendant's primary claim is that officers were not allowed to be in his yard during the execution of the search warrant. As detailed above, the search warrant authorized a search of the curtilage, and, as a result, authorized the search of the car.[2]

---

[2] The Court recognizes that the Seventh Circuit has stated that such a search is "problematic." *Griffin*, 827 F.2d at 1113-14 n.3. Indeed it can be problematic, and the safest path is to secure a search warrant for the vehicle, as the Seventh Circuit has stated. *See id.*; *see also Grupee*, 682 F.3d 143. The Court is also aware that the Government has expressly disclaimed any reliance on the warrant. However, the Court is unswayed.

2.

However, even if the warrant did not authorize a search of the curtilage, the officers still would have been authorized to be present in the curtilage.  In the single family home context, one must usually enter the curtilage before arriving at the residence, because most of those homes in the United States are set off from the road some distance. Therefore, the officers would have had to enter the curtilage to reach the home.  *Cf. State v. Brothers*, 12 Or. App. 435, 440 (1973) ("a warrant to search a specific apartment by necessary implication authorizes entry by the officers into the common hallway and stairway leading to that apartment").

This does not, however, mean that officers would be required to stay on sidewalks or other paths if a warrant only authorized the search

---

A number of courts have held that a search warrant for a residence or an address authorizes a search of vehicles found on the curtilage.  *See United States v. Silva*, 593 F. Supp. 2d 316, 318 (D. Mass. 2009); *In re One 1970 Ford Van, I.D. No. 14GHJ55174, Lic. No. CB 4030*, 111 Ariz. 522, 523 (1975); *State v. Reaves*, 627 So. 2d 54, 54 (Fla. App. 1993); *State v. Courtright*, 60 N.C. App. 247, 250-51 (1983); *Long v. State*, 532 S.W.2d 591, 595-96 (Tex. Crim. App. 1975).  *But see United States v. Barth*, 288 F. Supp. 2d 1021, 1026-28 (D.N.D. 2003) (holding that a warrant for residence and outbuildings did not cover automobiles located on curtilage); *People v. Sciacca*, 45 N.Y.2d 122, 127 (1978) ("It is clear that a warrant to search a building does not include authority to search vehicles at the premises.") (citing *People v. Hansen*, 38 N.Y.2d 17 (1975), and *People v. Dumper*, 28 N.Y.2d 296 (1971)).

of a house.[3]  Officer safety often requires law enforcement personnel to have officers in various parts of a house's curtilage when executing a warrant, to provide additional protection or to prevent an ambush. Furthermore, it is common to place officers in the side and back yards to catch any "runners" who seek to escape during the execution of a warrant.

Therefore, it is reasonable for officers to be present in the front, side, and back yards during a search of a residence, even if the warrant does not authorize the search of the curtilage.

In *United States v. Barth*, the district court held that, although officers were not authorized to search the curtilage of the buildings, they were lawfully on the property and they could pass their drug dog around the vehicles.  288 F. Supp. 2d 1021, 1028-29 (D.N.D. 2003).  The Court further held that after the police canine alerted, officers could search the vehicles for controlled substances.  *Id.*

---

[3]  Police are generally allowed to walk on these areas without raising any Fourth Amendment concerns.  *See United States v. Wells*, 648 F.3d 671, 679 (8th Cir. 2011).

Therefore, in any event, the officers were authorized to be in the yard and take the canine around the car.

B.

The Court hereby incorporates by reference the discussion regarding the search of automobiles contained in Part IV of this Opinion.

1.

Given the previous discussion, it would appear, at first blush, that the automobile exception would easily apply to the search of the car because the dog alerted outside the car. However, there is a wrinkle.

The automobile exception exists because cars are mobile, and evidence could therefore be destroyed before a warrant is obtained. *See United States v. Washburn*, 449 F.3d 808, 814 (7th Cir. 2006).

When a vehicle is not mobile, and officers know it is not mobile, the vehicle exception might not apply. *See United States v. Hatley*, 15 F.3d 856, 858-59 (9th Cir. 1994). The following factors should be weighed in determining whether the vehicle exception applies: "its location, whether the vehicle is readily mobile or instead, for instance, elevated on blocks, whether the vehicle is licensed, . . . and whether it has

convenient access to public roads." *California v. Carney*, 471 U.S. 386, 394 n.3 (1985).

2.

Here, the officers were told by a confidential source that the car was not operable. *See* Application for Warrant [d/e 12-1], page 2, ¶ 9. However, the officers knew that the vehicle was registered with the State of Illinois, *see id.*, and that the vehicle had been started by the Defendant on the afternoon of the date the search warrant was executed, *see* Investigative Report [d/e 12-2], page 1.

While there were indicia that the car was not operable, there were also some factors suggesting that it could be mobile. The car was capable of being started, it had "convenient access to a public road" as it was in the front yard adjacent to the street, and it was registered with the State of Illinois.

One must also consider the source of the information that the vehicle was inoperable: a confidential source. While confidential sources provide invaluable information, they are not 100% reliable. When

working with these sources, officers are wise to follow President Ronald Reagan's familiar maxim: "Trust but verify."

While the officers had good reason to believe that the car was inoperable, it was not a certainty, so the automobile exception does apply. *See Hatley*, 15 F.3d at 859 ("the Fourth Amendment does not require that officers ascertain the actual functional capacity of a vehicle in order to satisfy the exigency requirement"); *see also United States v. Hepperle*, 810 F.2d 836, 840 (8th Cir. 1987). Therefore, the Court concludes that the search was lawful under the automobile exception.

3.

In the alternative, if the officers had known with certainty that the car was inoperable and the automobile exception does not apply, the search would probably still be permissible.

There is a diminished expectation of privacy in "junker" automobiles, especially when they are located in close proximity to a sidewalk and public street. *See United States v. Ramapuram*, 632 F.2d 1149, 1153 (4th Cir. 1980); *see* Photograph [d/e 12-1], page 4 (poor-

quality photograph showing white Mustang in front lawn); Photograph [d/e 13-1], page 1 (color photograph showing front of house and lawn).

## VI.

The Defendant challenges the search of the Defendant all-terrain vehicle (ATV), also known as a four-wheeler. The ATV was located in the backyard of the residence, and a bag of suspected methamphetamine was found in the battery compartment (which is located under the seat). The ATV and methamphetamine were located 100 feet from the house.

## A.

The Defendant has stated that the ATV was located within the curtilage of the house. *See* Defendant's Reply [d/e 19], page 3 n.1.

"[C]urtilage questions should be resolved with particular reference to four factors: the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by." *United States v. Dunn*, 480 U.S. 294, 301 (1987).

In this case, the ATV and methamphetamine, while not adjacent to the house, were reasonably close to the home. The backyard is partially surrounded by fencing. *See* Investigative Report [d/e 12-2], page 2; Photographs [d/e 13-1], pages 2-4; Photographs [d/e 13-2]: Photographs [d/e 13-3], page 1. It would be hard to characterize the storage of an ATV in backyard (along with another ATV, a boat, and a jet ski) as being "intimately tied" to home life. While it does not appear that the Defendant has taken great steps to shield the activities at the rear of his lot from observation, there is visual privacy from several directions due to the presence of foliage. In addition, the Defendant placed the area under surveillance from a hidden camera.

Backyards are generally considered part of the curtilage. *See Bleavins v. Bartels*, 422 F.3d 445, 452 (7th Cir. 2005) ("Areas that are intimately connected with the activities of the home include, for example, backyards.") (quotation marks and ellipsis omitted) (collecting cases); *see also United States v. Wells*, 648 F.3d 671, 677-78 (8th Cir. 2011); *Lundstrom v. Romero*, 616 F.3d 1108, 1128-29 (10th Cir. 2010);

*United States v. Struckman*, 603 F.3d 731, 739 (9th Cir. 2010); *United States v. Romero-Bustamante*, 337 F.3d 1104, 1108 (9th Cir. 2003).

After careful consideration, the Court concludes that the backyard is part of the curtilage of the home.

## B.

Given the Court's earlier conclusions regarding the curtilage, the Court finds that the agents were authorized to search the area, and open any closed containers.

Accordingly, the Court concludes that the warrant authorized the search of the battery compartment of the ATV.

## C.

The Court concludes that the privacy interests in the battery compartment of ATV is lower than the privacy interests that an individual would have in passenger compartment, trunk, or glove box of an automobile. The Court has examined the photographs of where the drugs were recovered, and how they were placed in the battery compartment. The Court notes from the photographs that there apparently is no dedicated storage area. *See* Photographs [d/e 13-3],

page 2. Rather, the drugs were lying directly on top of the battery. *See id.* Furthermore, the only other open compartment appears to contain the top of the engine block. *See id.*

Accordingly, the battery compartment is more comparable to the engine compartment of an automobile, *see United States v. Sawyer*, 630 F. Supp. 889, 892-93 (D. Me. 1986); *State v. Ball*, 219 N.J. Super. 501, 508-09 (1987); *contra State v. Mitzlaff*, 80 Wash. App. 184, 189 (1995), or the engine room of a boat, *see United States v. One Blue Lobster Vessel Named Tony, Jr., Official No. 559940*, 639 F. Supp. 865, 870 (S.D. Fla. 1986), where there is not a legitimate expectation of privacy, rather than a scooter's glove or seat compartment, *United States v. Sykes*, No. 05-46, 2006 WL 3193745 (E.D. La. Nov. 2, 2006); *McMillan v. United States*, 527 A.2d 739 (D.C. 1987), or a motorcycle's saddlebags or storage compartment, *see United States v. Burbridge*, 252 F.3d 775, 778 n.4 (5th Cir. 2001); *United States v. Adkins*, No. 2:07-CR-110, 2008 WL 2368138 (E.D. Tenn. June 6, 2008), where there would be more of an expectation of privacy.

In addition, the Court notes that the ATV compartment was unlocked. This further erodes any argument that the Defendant had a reasonable expectation of privacy in the battery compartment of the ATV.

Finally, the Court notes that while ATVs are subject to regulation in the State of Illinois,[4] they generally cannot be driven legally on the streets.[5]

## D.

In any event, the ATV is a vehicle that was operational, and it is subject to the motor vehicle exception. The officers had probable cause to suspect that contraband was hidden in or about the ATV, based upon the Defendant's arrest, the granting of the search warrant, his propensity

---

[4] *See* 625 ILCS 5/3-101(d) (owners of ATVs are required to obtain titles from the Illinois Secretary of State); *Regulations for All-Terrain Vehicles & Off-Highway Motorcycles*, Illinois Department of Natural Resources, available at http://dnr.state.il.us/publications/pdf/00000011.pdf (last visited Sept. 25, 2012).

[5] *See* 625 ILCS 5/11-1426.1 (ATVs prohibited from use on streets, highways, or roadways in Illinois, unless authorized by local city ordinance); 625 ILCS 5/1-101.8 (defining ATV). The Court has reviewed the municipal code of Quincy, Illinois, and has not found any authorization for the use of ATVs on public street pursuant to 625 ILCS 5/11-1426.1(d). *See* Quincy, Ill., Mun. Code Ch. 20 (Traffic & Vehicles), available at http://www.ci.quincy.il.us/cityclerk/Codebook/codebook.pdf (last visited Sept. 25, 2012); Quincy, Ill., Mun. Code Amendments, available at http://www.ci.quincy.il.us/cityclerk/Codebook/amends.pdf (last visited Sept. 25, 2012).

to store methamphetamine in vehicles, and the fact that the ATV was suspicious (its exhaust was covered, and it was left uncovered and unprotected in February). Therefore, the officers were authorized to search the battery compartment.

## VII.

### A.

The Court declines to adopt the hypertechnical interpretation of the search warrant, instead interpreting it in a "commonsense and realistic fashion." *See United States v. Ventresca*, 380 U.S. 102, 108 (1965); *United States v. Srivastava*, 540 F.3d 277, 289-90 (4th Cir. 2008); *United States v. Angelos*, 433 F.3d 738, 745 (10th Cir. 2006); *United States v. Gorman*, 104 F.3d 272, 275 (9th Cir. 1996).

Common sense dictates that the greater zone of privacy (the house) includes the lesser (the curtilage).

### B.

Even if the warrant did not authorize a search of the curtilage, the Court would still deny the Motion to Suppress under the good-faith exception, which provides that evidence will not be suppressed when it is

discovered by officers acting in good faith and the reasonable, though mistaken belief, that they were authorized by a signed search warrant. *See United States v. Leon*, 468 U.S. 897, 924 (1984).

The Court notes that, in addition to the warrant, the officers also brought a drug dog when executing the warrant.

The Court is not persuaded by the Defendant's argument that the officers did not act in good faith. The officers' decision to include distances and descriptions of fences should be applauded, not criticized. Including such details in a report does not suggest to the Court that the officers felt guilty about executing a deficient warrant.

## VIII.

*Ergo*, the Court hereby ADOPTS the Report and Recommendation [d/e 16] entered by U.S. Magistrate Judge Byron G. Cudmore, DENIES IN ITS ENTIRETY the Defendant's Motion to Suppress [d/e 9], and OVERRULES the Defendant's Objections to the Report and Recommendation [d/e 17].

IT IS SO ORDERED.

ENTER: September 26, 2012

FOR THE COURT:              */s/ Richard Mills*

Richard Mills
United States District Judge